# Harbison-Walker Refractories Co. v. Brown et al.

Feb. 11, 1944.

John M. Theobald and Thomas D. Theobald, Jr., for appellant.

H. R. Wilhoit for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, and plaintiff below, Harbison-Walker Refractories Company, is a corporation engaged in manufacturing firebrick in the town of Olive Hill, Carter County, Kentucky. On and prior to October 7, 1941, Willard J. Brown, 58 years old, was and had long since been its employee in its plant in Olive Hill. He met his

death at about 4 p. m. on that day on the premises of his employer, leaving a widow and some stepchildren, he having no child of his own. The widow made application to the Compensation Board for an award, pursuant to the terms of the statute, and upon the evidence introduced before a referee the latter sustained the application and awarded to the applicant the full amount allowed in such cases, as measured by the rule provided by the statute. Later a hearing before the Full Board was had and it upheld the referee's award. Appellant then petitioned the Carter Circuit Court for a review of the board's finding and which was heard on the record made at the board hearing, whose award the court affirmed and, questioning the court's action in making that affirmance, appellant prosecutes this appeal.

While the grounds urged for a reversal are 5 in number, as sub-divided by counsel, they may be reduced to only two which are: (1) that the death was not accidentally produced by coming in contact with an electric current on the premises but was produced by natural causes—apoplexy or cerebral hemorrhage—and (2) that the death of decedent did not arise out of or in the course of his employment. Before taking up the disposition of either of them we deem it proper to state that we have been considerably handicapped in trying to understand the situation surrounding the death of decedent, or the physical condition of the premises, because of a failure on the part of the litigants to prepare and introduce, either a map showing the situation of the grounds and material parts thereof so as to give us a proper understanding of the controversy, or introduce photographs revealing such information. Being strangers to the scene we have been compelled to dig out from somewhat obscure expressions of the witnesses the best understanding that could be obtained therefrom relative to such matters. We make this statement so that counsel in this and other cases may be informed that such neglects, not only places additional burdens on this court, but also sometimes produces misconceptions on our part and possible errors in our opinions. Having said this much we will now proceed to determination of ground (1).

At the time of the accident the decedent had finished his eight-hour shift about one and a half hours before he met his death and was last seen at about 2:30 p. m.

by the only eyewitness who testified in the case. He was then going toward the washroom provided by appellant for the benefits of its employees. The main entrance to appellant's premises was on the opposite side of its main building from the one upon which the deceased was killed, and the washroom was a considerable distance from the same spot and also apparently on the opposite side thereof. Out from the rear of the main building were other smaller ones, including a supply room, a shop and perhaps others, the supply room being constructed in the shape of an "L" and connected with the shop at one of the ends. Between the other end and the shop was what is called in the record a "blind" room and in that space there was located an implement known as a "welder" which is operated by a current of electricity of about 440 volts. However, the evidence shows that there was connected with it a copper tube driven into the ground some eight or nine feet as a conductor of electricity in order to keep the exposed wrapping (or as designated by counsel, the housing) of the welder from becoming charged so as to be dangerous to persons who might come in contact with it. Such safeguarding construction is undisputed in the case. Some ten or fifteen minutes before 4 o'clock p. m. the same eyewitness saw decedent depart from the plant at a point about 70 feet from the shop. At the rear of the main building of the plant there was a graveled road leading from the premises which decedent usually traveled in coming to and going from his work in performing his day's task.

The point where the welder was located was anywhere from 15 to 35 feet from that rear gravel road as shown by witnesses for both applicant and employer, but one witness said that it was 15 or 20 feet from the center of that gravel road as he concluded. But neither he nor any one else testified to having measured the distance. Scattered around over the rear premises of appellant through which the rear passway ran were pieces of unappropriated timber suitable for kindling which some of the employees at times, including perhaps decedent, would gather up and carry home for such purposes. The only eyewitness who testified in the case, one Lawson, said that at about 4 o'clock decedent "came out of the plant about 70 feet from the shop and he come walking on out through there to the shop and there is a little supply room close to the shop and be-

tween the shop and supply there was a welder setting there. * * * I was standing there watching for my supper, my little boy was bringing it and I seen him walk out there and he reached down and picked up a plank, had his bucket in one hand and plank in the other and laid it down and picked up another and I looked off to see if my little boy was bringing my supper and looked back over that way right straight across and I seen him stretched out on a thing over there,'' which he stated was the welder. He then described the position of decedent which was that his feet were about five feet from the welder with the back of his hands touching the welder and his face within his hands. Witness immediately went to the spot and took hold of the body of decedent and discovered that mucous was running from the mouth and that it and his nose were discolored. He immediately called two other employees to the scene who responded and arrived in a very short time. By that time decedent was about to fall off the welder when the latter two took hold of him and lifted him upon a cushion of an automobile which they had hurriedly procured. A doctor was called but decedent was dead when the physician arrived.

There was found in decedent's pockets some headache powders, some sticking plaster and other articles not necessary to mention. Lawson stated that the welder was some 35 feet from the rear graveled road traveled by decedent in departing for his home. None of the witnesses who touched the body of decedent before he was removed from the welder felt any shock except one who stated that he experienced a slight tingling, while another witness stated that he saw some steam emanating, as we understand from the record, around the copper pipe extending into the ground as hereinbefore described. Besides the electrical engineer who testified that the welder as so equipped for safety would not shock a person coming in contact with it, others testified that when the current was on they—even on that day following the death of decedent—seated themselves on the welder and received no shock, which they were induced to do upon the question being agitated as to whether contact would produce a shock. One witness testified, which was corroborated by others, that he had, a short while prior thereto, seated himself on the welder when it was connected with the electrical current and he received no shock. The coroner with the undertaker,

and in the presence of the physician who was called, stripped decedent after his death and closely examined his body, finding no marks that contact with an electrical current almost universally produces, although they did find an old scab on the back of one of his hands which was examined with a microscope and through which the hair on the back of his hand had penetrated. Also they found that on either side of that scab were plainly visible marks of adhesions of sticking plaster, indicating quite conclusively that the injury was an old one. Decedent had been warned by the foreman of the company, as had also other employees, not to remove from the grounds any waste timber, either for kindling or other purposes. The testimony also showed that decedent's look and appearance indicated an unhealthy condition. He frequently complained of severe headaches and some month or more prior to his death he was stricken with some kind of spell and was treated by his physician for some time during which he, of course, was absent from his work. It would make the opinion too long to rehearse all of the evidence directed to the issues of (a) whether decedent's death was produced by coming in contact with an electrical current or (b) whether it was produced by natural causes, since we have concluded that our ground (2), supra, authorizes a reversal of the judgment, and for which reason we will not finally determine either of those questions. However, it might be said that the testimony largely preponderates against the death being produced by a current of electricity passing through decedent's body, and it likewise largely preponderates in favor of the contention that his death was produced by natural causes, so much so as to possibly authorize the court to say that the contrary conclusions, as arrived at by the board and affirmed by the court, were founded on unauthorized surmises and unsupported by any testimony of convincing force.

Turning now to our ground (2) it will be seen that decedent had ceased working for the day at least one hour and thirty minutes before the witness, Lawson, saw him, and witnessed what occurred as he described. It was clearly shown, and undisputed, that in order to reach the welder decedent not only had to depart from the graveled road upon which he was traveling to go to his home, but would have to retrace his steps in order to get back into that road for the purpose of continuing his journey to his home. Therefore, the case is unlike

some of those cited by counsel for appellees when the servant departed from his immediate pathway after his work had ceased in order to correct something, or to remove something detrimental to the interests of his employer, or that might produce injury to a fellow servant upon which mission the employee would be serving his master. Such was the case in Harlan Gas Coal Co. v. Trail, 213 Ky. 226, 280 S. W. 954, and in the case of Lawrence Leather Co. v. Barnhill, 249 Ky. 437, 61 S. W. (2d) 1. The facts in them were quite different from those appearing in this case, in that the departure from the pathway of the servant was upon vacant ground and the slight departure only shortened the distance around the curving pathway and which route required no retracing by the servant in order to get back into the pathway from whence he departed. Substantial differential features exist between other cases relied on by appellees' counsel and which renders none of them decisive of the question as is here presented.

It should be remembered at the outset that compensation statutes are by no means all coverage accident policies. The only accidents for which the statute furnishes compensation are those "arising out of and in the course of" the employment. KRS 342.005. As above stated the evidence uncontradictedly shows that Brown's service for the day had terminated some hour and thirty minutes before his death. He had more than ample time to make preparation for his departure from the plant at which he was employed. When making that belated departure he digressed from his unobstructed route for no purpose of serving his master, but on the contrary for a purpose—thoroughly established—of serving his own purpose, i. e. the gathering of an armload of kindling. It can be scarcely contemplated that any one reading this record could arrive at any other conclusion, and most certainly is it impossible to conclude that decedent's departure from the traveled route was made for and on behalf of the employer while digressing from his route for a purpose of his own, which is as equally affirmatively shown. As was held in the Barnhill case, supra (and likewise held in a number of prior and subsequent cases), the words "arising out of" refer to the cause of the accident and the words "in the course of" refer to the time, place and circumstances under which it occurred. Therefore, if the accident happened while the servant was performing the service for which he

was employed, the injury or death produced would necessarily "arise out of" the employment. Likewise if the accident occurred—not only during the period of employment but within a reasonable time thereafter for preparation to enter upon the service, or preparation for departure from the service and the thing done was in the interest of the master or an integral part of the preparation—it is rightfully held to be "in the course of the employment."

Since, however, the compensation act does not take the place of an accident policy no accident to a servant at a time and in the circumstances of this case could be said to come within the protecting privileges of the statute, not being embraced within its terms. Among the domestic cases supporting our conclusion are: Consolidation Coal Company v. Ratliff, 217 Ky. 103, 288 S. W. 1057; Meem Haskins Coal Co. v. Jent, 269 Ky. 716, 108 S. W. (2d) 726, 727; and Meem Haskins Coal Corp. v. Bach, 278 Ky. 535, 128 S. W. (2d) 913, and others cited therein. The same conclusion is sustained by other courts, and by other opinions of this one, all of them sustaining the proposition that when a servant departs from his master's service to engage in one for his exclusive benefit, an accident received during such departure is not compensable under the compensation act.

It has often been said that "bad cases make bad law." By the phrase "bad cases" is meant that the tribunal sympathizes with one litigant, while the facts and the law favor the other one, and in the wrestle between the two, sympathy wins over the law and the facts, which produces the "bad law." We are not without sympathy for the widow in this case, but we are also aware that we should not allow our sympathy to overcome the plain provisions of the law.

Wherefore, for the reasons stated, the judgment is reversed with directions to set it aside and to enter one directing the compensation board to dismiss the application.